# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.:

SUNSHINE PLAZA OF SOUTH
FLORIDA, INC., a Florida corporation,

      Plaintiff,

v.

PILOT TRAVEL CENTERS LLC,
A Delaware limited liability company,

      Defendant,

_____/

## COMPLAINT

COMES NOW, the Plaintiff, SUNSHINE PLAZA OF SOUTH FLORIDA, INC. ("Plaintiff"), by and through undersigned counsel, and hereby sues the Defendant, PILOT TRAVEL CENTERS LLC ("Defendant," and collectively with plaintiff, the "Parties"), and in support thereof alleges:

1. This is an action for declaratory relief and for damages involving property and matters in excess of $50,000.00.

2. Plaintiff is a Florida corporation that operates and is headquartered in Miami-Dade County, Florida.

3. Defendant is a Delaware limited liability company that engages in business nationwide, including in Miami-Dade County, Florida, and is registered with the Florida Secretary of State, Division of Corporations as a foreign limited liability company doing business in this state.

4. Defendant is subject to the general and specific jurisdiction and processes of this Court

1

under both federal and state law, including, without limitation, the due process clause of the United States Constitution and Florida's long-arm statute, with specific respect to the following provisions: Fla. Stat. § 48.193(1)(a) subsections 1 and 7; Fla. Stat. § 48.193(2); Fla. Stat. §48.193(3); Fla. Stat. § 48.193(5).

5.      Defendant has engaged in the acts giving rise to the claims enunciated in this Complaint within this jurisdiction, and within this Judicial District both in interstate commerce and utilizing the international wire and mail systems including, but not limited to, those encompassed on the worldwide web or internet.

6.      This action arises out of and relates to the personal and business transactions and other specific and general activities of the Defendant in Florida, including in Miami-Dade County, Florida, activities which are ongoing in nature. These transactions and activities are described in detail throughout this Complaint. As a result of these transactions and activities, directed at Plaintiff, the Defendant is subject to personal jurisdiction in Florida pursuant to applicable state and federal law.

7.      The appropriate venue for this lawsuit is the Eleventh Judicial Circuit in and for Miami Dade County pursuant to Fla. Stat. § 47.011, because the breach of contract took place, or accrued, in Miami Dade County. Additionally and/or alternatively, the appropriate venue for this lawsuit is the Eleventh Judicial Circuit in and for Miami Dade County pursuant to Fla. Stat. § 47.011, because the property that is the subject of the agreement entered into by the parties is located in Miami-Dade County, Florida.

8.      Plaintiff has retained the undersigned attorneys and is obligated to pay them their reasonable attorneys' fees and costs.

9.      All conditions precedent to the commencement of this lawsuit have been met, have occurred, have been excused, or have been waived.

## **GENERAL ALLEGATIONS**

10.     Plaintiff owns an independent service station located at 12200 NW South River Drive, Medley, FL 33178 (the "Station") that (1) sells gasoline and diesel fuel to the public, and (2) operates a retail convenience store.

11.     Defendant is a Delaware limited liability company that, amongst other things, licenses its brand to independent service station owners such as Plaintiff so that they may operate their stations under said brand. Defendant also enters agreements with independent service stations owners whereby, amongst other things, it (1) sells diesel fuel to the public through said owners' service stations, and (2) provides credit and debit card payment processing systems and services to said owners' service stations for purposes of processing all payments that take place via credit and debit cards at said stations.

12.     On or about February 23, 2011, Plaintiff and Defendant entered into that certain Equipment Lease and Thru-Put Agreement (the "Agreement," a copy of which is attached hereto as **Exhibit "1"**). The Agreement contains a prevailing party attorneys' fees and costs provision.

13.     Pursuant to the Agreement, Plaintiff would provide Defendant the use of certain of Plaintiff's tanks located at the Station for purposes of offering Defendant's diesel fuel for retail sale to the public, and Defendant would pay Plaintiff a fee for each gallon of diesel sold through Plaintiff's Station, with the fee to vary pursuant to the number of gallons of diesel fuel sold in any given month. In addition, pursuant to the Agreement, Defendant would supply all of Plaintiff's credit and debit card payment and processing needs, such that all payments made by credit or debit card at Plaintiff's Station, including all payments for products and services unrelated to Defendant, would be processed through Defendant's system and paid to Defendant, with Defendant then collecting a fee for same and paying the balance to Plaintiff within a specific time frame set forth in the Agreement. Finally, pursuant to the Agreement, Defendant would also license the rights to

3

use its "Pilot" brand to Plaintiff for purposes of marketing Plaintiff's Station, including via Station signage and other Station traditional materials.

14.     The term of the Agreement was ten (10) years, or until February 20, 2021, with an option of four renewals of five (5) years each were the parties to elect same at the relevant times.

15.     On or about August 2020, a little over 5 months before the term of the Agreement was set to expire, Plaintiff entered into that certain Addendum to Equipment Lease and Thru-Put Agreement (the "Addendum," a copy of which is attached hereto as **Exhibit "2"**). The Addendum provides that the Parties agree to a 10-year extension of the Agreement's term, effectively extending the term of the Agreement through February 20, 2031.

16.     Shortly after signing of the Addendum, Defendant, unilaterally and without Plaintiff's consent, began withholding partial payments that were due to Plaintiff pursuant to the Agreement, and only making some of the remaining payments to Plaintiff long after they were due, and only after repeated complaints by Plaintiff.

17.     Specifically, because Defendant had exclusive control over all of the credit and debit card payments made at the Station (with respect to sales of its diesel fuel, but also with respect to non-diesel fuel and convenience store sales), Defendant was supposed to collect all of the credit and debit card payments, and then (1) keep for itself the moneys corresponding to diesel fuel sales, and (2) pay Plaintiff the sales corresponding to non-diesel fuel and convenience store sale, as well as the fixed, per gallon fee it had agreed to pay Plaintiff for every gallon of diesel fuel sold. Defendant was supposed to make those payments to Plaintiff within the time frame and specific deadlines set forth in the Agreement. Instead, after the Addendum was entered into by the Parties, and in flagrant violation of the Parties' Agreement, Defendant implemented a policy whereby it began withholding payments that it owed Plaintiff in order to compensate itself, Defendant, for any failed

transactions associated with the sale of its diesel fuel, a practice that was neither contemplated by, nor agreed to, in the Agreement.

18.     By way of illustration, assuming that Plaintiff made a total of $100,000 worth of credit and debit card sales at its Station on the first day of any given month, and that those $100,000 consisted of $80,000 of diesel fuel sales (representing 20,000 gallons of diesel fuel sold at $4/gal.), and $20,000 of convenience store sales, Defendant was required to pay Plaintiff a total of $23,400, less a small fee credit and debit card processing fee. The $23,400 consists of $20,000 for the convenience store sales, plus $3,400 for the 20,000 gallons of diesel sold (per the Agreement, Plaintiff is entitled to payment of $0.17 per gallon of the first 131,000 gallons of diesel sold per month). However, instead of paying Plaintiff the $23,400 within the time frame provided in the Agreement, Defendant instead **deducted from the payment due Plaintiff any failed transactions associated with the sale of its diesel fuel**, which, as previously stated, was **not** agreed to and which Plaintiff had nothing whatsoever to do with. Given that Defendant exercised exclusive control of the credit and debit card system, the cost of any "failed transactions" related to the sale of diesel fuel was to be borne exclusively by Defendant. Instead, Defendant improperly and illegally withheld funds from Plaintiff in order to cover the costs of **its** failed transactions. So, continuing with this same example above, if the same day that Plaintiff made $80,000 worth of diesel fuel sales through Defendant's credit and debit card system, the system generated $1,000 worth of "failed transactions" related to those $80,000 worth of diesel fuel sales, Defendant would simply – and with no authority whatsoever to do so – **deduct** $1,000 from the $23,400 that it owed Plaintiff for that day, paying Plaintiff only $22,400.

19.     This policy of withholding payments that it owed to Plaintiff in order to compensate itself, for failed transactions associated with the sale of its diesel fuel was done by Defendant in flagrant

violation of the Agreement, with no consent on the part of Plaintiff, and over the repeated objections and complaints of Plaintiff.

20.     To make matters worse, not only were these payments being improperly deducted or withheld by Defendant, but when Defendant would remit the overdue payments owed to Plaintiff (namely, the amounts previously withheld by Defendant for "failed transactions" for diesel fuel registered by Defendant's system), the payments were issued long after the date they were due under the contract, causing significant damage to Plaintiff's cash flow, income stream, and general business operations.

21.     In addition, subsequent to entering into the Addendum, Defendant -- without notice to, or the acquiescence of, Plaintiff -- began pricing the diesel fuel it sold through Plaintiff's Station at prices far above prevailing market rates, leaving Plaintiff in a highly uncompetitive position in the local market and significantly affecting both fuel and retail store sales. Defendant was aware that the sale of diesel fuel at the Station was a significant portion of Plaintiff's revenue stream (representing as it did the vast majority of the fuel sales that took place at the Station), and that this was so both with respect to the per gallon fees the diesel sales generated, as well as the foot traffic the diesel sales generated for Plaintiff's convenience store. As such, by pricing its diesel fuel well above market rates, Defendant was effectively hobbling Plaintiff's business, something of which Plaintiff complained incessantly to Defendant to no avail.

22.     Upon information and belief, this practice was undertaken by Defendant in a concerted effort to undermine the value of Plaintiff's business so that Defendant could attempt to purchase the Station at fire sale prices. It is also consistent with Defendant's practice at the time -- as alleged in a lawsuit filed against Defendant's majority shareholder, Berkshire Hathaway, by it minority shareholders, the Haslam family members who founded Pilot – of intentionally adversely

impacting Defendant's profitability in an effort to bring down the price at which Berkshire would have to buy the Haslam's family's remaining minority interest in Defendant.

23.     Given  the numerous difficulties Plaintiff was experiencing working with Defendant, and the multiple breaches committed by the Defendant (and which it continues to commit to this day) in continuously underpaying Plaintiff the monies Defendant owes under the Agreement (and only paying said monies at its own convenience, almost always significantly later than required by the Agreement), in 2023 Plaintiff was forced to begin exploring the possibility of selling the Station and retiring from the business.

24.     Sometime in late 2023, Plaintiff identified a possible buyer for the Station ("Buyer") and entered into an agreement with same for the purchase of the Station, contingent upon a right of first refusal granted to Defendant in the Agreement. Pursuant to the Agreement with Defendant and the right of first refusal provided for by same, Plaintiff notified Defendant of the agreement with Buyer, and timely transmitted a copy of the purchase agreement between Plaintiff and Buyer.

25.     In response, Defendant waived its right of first refusal pursuant to the Agreement, freeing Plaintiff to sell the Station to Buyer pursuant to Plaintiff's own agreement with Buyer.

26.     However, in the letter notifying Plaintiff that it was waiving its right of first refusal, Defendant self-servingly stated that, in its opinion, under the Agreement (1) Plaintiff could not sell the Station to Buyer unless Buyer accepted an assignment in full of the Agreement, or, alternatively, (2) were Buyer not to accept such an assignment in full of the Agreement, Plaintiff would have to pay Defendant all damages due it under the Agreement, which damages would include all consequential damages including lost profits.

27.     Plaintiff takes exception to this self-serving, inaccurate, and legally unsupported reading of the Parties' Agreement as to both issues: namely, the Agreement does **not** make a sale of the Station to Buyer contingent upon Buyer accepting a full assignment of the Agreement, and the

Agreement expressly limits the liability of either Party by, amongst other things, **expressly excluding consequential damages**, which include lost profits. Moreover, a close reading of the Agreement reveals that the Agreement itself is illusory and unenforceable as further set forth below.

28.   Because Defendant has cast doubt on the Parties' rights under the Agreement under the current context of a prospective sale to Buyer, Plaintiff has elected to bring this action seeking, amongst other things, declaratory relief to resolve the issues of contractual interpretation raised above.

29.   The Plaintiff has engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable attorneys' fee for which the Defendant is responsible pursuant to Paragraph 30 of the Agreement and F.S. §57.105.

**COUNT I**
**DECLARATORY RELIEF PURSUANT TO**
**FLA. STAT. §86.021 (ASSIGNMENT OF CONTRACT)**

30.   Plaintiff incorporates by this reference Paragraphs 1 through 29 above as if fully set forth herein and further alleges as follows:

31.   Plaintiff is in doubt about its right to sell its Station to Buyer free of any condition requiring that Buyer first accept a full assignment of the Agreement that currently exists between Plaintiff and Defendant.

32.   Specifically, Defendant has argued that Paragraph 23 of the Agreement provides that any sale of the Station to a prospective buyer to Buyer **is** contingent upon Buyer accepting a full assignment of the Agreement. Plaintiff disagrees, as Paragraph 23 does not provide for that at all.

33.   Specifically, Paragraph 23 of the Agreement provides, *in toto*, as follows:

> **23.   Right of First Refusal.** If Dealer receives a bona fide offer to purchase, its interest in the Location from a third party (excluding a person or entity that is or is directly or indirectly controlled by one or more members of the family

8

that controls Dealer or a trust for the benefit of any such person) that it intends to accept, it will give notice to PTC of the identity of the offeror and a complete and accurate copy of the written offer.  PTC will have thirty (30) calendar days to assess the offer and determine if PTC will acquire the Location for the price and terms contained in the offer.  If PTC relinquishes its right to acquire the Location, then Dealer may only sell the Location to the offeror under the same material terms and conditions as presented to PTC.  Dealer must assign this Agreement to the new owner under the same terms and conditions contained in this Agreement.  Except for immaterial changes in the offer, (e.g.. a minor change in the closing date), Dealer must present any amended terms to PTC and allow PTC twenty (20) calendar days to accept the amended offer.  If Dealer sells the Location after PTC relinquishes PTC's option right, Dealer, at the request of PTC, shall confirm and provide written proof of the lack of any material change to the offer as last presented by Dealer. If Dealer fails to so confirm the lack of any material change, PTC shall have the right to sue Dealer for specific performance, pursuant to the terms of the offer last presented to PTC. Should PTC prevail in its suit for specific performance, the parties shall close said purchase and sale within thirty (30) calendar days.

34.   The single sentence in this paragraph that Defendant relies on in support of its position is the following: "Dealer must assign this Agreement to the new owner under the same terms and conditions contained in this Agreement." Plaintiff disagrees that this sentence makes a sale of the Station contingent on a prospective buyer accepting assignment of this Agreement, but rather interprets this sentence to mean that were a prospective buyer to accept an assignment of the Agreement, Plaintiff could not offer to vary the terms of the Agreement in any way, and the prospective buyer would have to accept assignment under the exact terms contained in the Agreement. Moreover, "Dealer must assign this Agreement to the new owner" is simply not the same as "the new owner must accept an assignment of the Agreement."

35.   Because of the Parties' conflicting interpretation of the language of Paragraph 23, Plaintiff seeks to have the construction and/or validity of its right to sell the Station to Buyer (without such sale being contingent upon Buyer first accepting a full assignment of the Agreement), determined by the Court, and to obtain a declaration of rights, status, or other equitable or legal relations thereunder.

36.     Specifically, the uncertainty caused by the language of Paragraph 23 places Plaintiff in "doubt about [its]…rights under a…contract," and thus pursuant to Florida law, Plaintiff is entitled to "have determined any question of construction or validity arising under such…contract…and obtain [from this Court] a declaration of rights, status, or other equitable or legal relations thereunder." Fla. Stat. §86.021.

37.     There is a bona fide actual, present and practical need for the declaration of rights of the parties.

38.     All antagonistic and adverse interests are before the court.

39.     The within declaratory action is sought not for the purpose of obtaining legal advice from the court, but rather for the purpose of determining the rights and obligations of the parties under law.

40.     Plaintiff has no adequate remedy at law.

41.     The Plaintiff has engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable attorneys' fee for which the Defendant is responsible pursuant to Paragraph 30 of the Agreement and F.S. §57.105.

        WHEREFORE, Plaintiff, SUNSHINE PLAZA OF SOUTH FLORIDA, INC., respectfully requests that this Honorable Court (i) declare that pursuant to the Agreement, Plaintiff has the right to sell the Station to Buyer without such sale being contingent upon Buyer first accepting a full assignment of the Agreement, and (ii) any and all further relief in Plaintiff's favor, including all of Plaintiff's attorneys' fees and costs related to this action, that this Court deems just and proper.

### COUNT II
### DECLARATORY RELIEF PURSUANT TO
### FLA. STAT. §86.021 (CONSEQUENTIAL DAMAGES AND LOST PROFITS)

42.     Plaintiff incorporates by this reference Paragraphs 1 through 29 above as if fully set forth herein and further alleges as follows:

43.     Plaintiff is also in doubt about its exposure to damages in the event that it sells the Station to Buyer without Buyer first agreeing to a full assignment of the Agreement.

44.     Specifically, Defendant has argued that Paragraph 31 of the Agreement does not limit either of the Parties' liability to consequential damages, including but not limited to, lost profits.

45.     Paragraph 31 of the Agreement provides, *in toto*, as follows:

> **31.     Limitation of Liability.** EACH PARTY ACKNOWLEDGES AND AGREES WITH THE OTHER, THAT IN NO EVENT WILL EITHER PARTY, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, SHAREHOLDERS OR REPRESENTATIVES BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR AWARDS, INCLUDING DAMAGES OR COSTS INCURRED AS A RESULT OF LOSS OF TIME, LOSS OF SAVINGS, LOSS OF PROPERTY OR LOSS OF GOODWILL, WHETHER FORESEEABLE OR UNFORESEEABLE, WHICH MAY ARISE OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT.

46.     Plaintiff's position is that Paragraph 31 of the Agreement, titled "Limitation of Liability," expressly and unequivocally precludes either Party from being awarded "**any special, indirect, incidental, punitive or consequential damages**," "**whether foreseeable or unforeseeable**," and that this broad swath of excluded damages includes lost profits.

47.     Defendant's position is that Paragraph 31 does *not* preclude either Party from being awarded lost profits damages.

48.     Because of the Parties' conflicting interpretation of the language of Paragraph 31, Plaintiff seeks to have the construction and/or validity of Paragraph 31 -- as well as whether pursuant to same, the Parties are barred from being awarded lost profits damages, amongst other things -- determined by the Court, and to obtain a declaration of rights, status, or other equitable or legal relations thereunder.

49.     Specifically, the uncertainty caused by the language of Paragraph 31 places Plaintiff in "doubt about [its]…rights under a…contract," and thus pursuant to Florida law, Plaintiff is entitled

to "have determined any question of construction or validity arising under such…contract…and obtain [from this Court] a declaration of rights, status, or other equitable or legal relations thereunder." Fla. Stat. §86.021.

50.    There is a bona fide actual, present and practical need for the declaration of rights of the parties.

51.    All antagonistic and adverse interests are before the court.

52.    The within declaratory action is sought not for the purpose of obtaining legal advice from the court, but rather for the purpose of determining the rights and obligations of the parties under law.

53.    Plaintiff has no adequate remedy at law.

54.    The Plaintiff has engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable attorneys' fee for which the Defendant is responsible pursuant to Paragraph 30 of the Agreement and F.S. §57.105.

WHEREFORE, Plaintiff, SUNSHINE PLAZA OF SOUTH FLORIDA, INC., respectfully requests that this Honorable Court (i) declare that pursuant to the Agreement, neither Party may be awarded "any special, indirect, incidental, punitive or consequential damages," "whether foreseeable or unforeseeable," including lost profits damages, and (ii) any and all further relief in Plaintiff's favor, including all of Plaintiff's attorneys' fees and costs related to this action, that this Court deems just and proper.

### COUNT III
### DECLARATORY RELIEF PURSUANT TO
### FLA. STAT. §86.021 (ILLUSORY CONTRACT)

55.    Plaintiff incorporates by this reference Paragraphs 1 through 29 above as if fully set forth herein and further alleges as follows:

56.    Plaintiff is in doubt about his rights regarding the illusory nature of the Agreement, given that it gives Defendant exclusive discretion whether to perform under same, affording no ability

for Plaintiff to enforce the Agreement against Defendant were Defendant to fail to perform: namely, the Agreement does not require that Defendant keep the relevant tanks supplied with diesel fuel at all, much less pursuant to a specific plan or schedule. As such, the Agreement affords Defendant the exclusive discretion to decide whether to fill the tanks at all, and were Defendant to choose not to – for example, to gain leverage over Plaintiff in a negotiation – Defendant could do so, and Plaintiff would have no legal recourse whatsoever.

57.     Accordingly, Plaintiff understands the Agreement to be illusory and thereby subject to rescission, which Plaintiff seeks as a remedy in a different count of this Complaint.

58.     Because of Plaintiff's uncertainty regarding the illusory nature of the Agreement, Plaintiff seeks to have the construction and/or validity of the Agreement determined by the Court -- specifically as to whether the Agreement is illusory -- and to obtain a declaration of rights, status, or other equitable or legal relations thereunder.

59.     Specifically, the uncertainty caused by the fact that the Agreement does not require that Defendant keep the relevant tanks supplied with diesel fuel at all, much less pursuant to a specific plan or schedule -- and thus were Defendant to choose not to fill said tanks, Plaintiff would have no legal recourse against Defendant whatsoever -- Plaintiff is entitled to "have determined any question of construction or validity arising under such…contract…and obtain [from this Court] a declaration of rights, status, or other equitable or legal relations thereunder." Fla. Stat. §86.021.

60.     There is a bona fide actual, present and practical need for the declaration of rights of the parties.

61.     All antagonistic and adverse interests are before the court.

62.     The within declaratory action is sought not for the purpose of obtaining legal advice from the court, but rather for the purpose of determining the rights and obligations of the parties under law.

63.     Plaintiff has no adequate remedy at law.

64.     The Plaintiff has engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable attorneys' fee for which the Defendant is responsible pursuant to Paragraph 30 of the Agreement and F.S. §57.105.

WHEREFORE, Plaintiff, SUNSHINE PLAZA OF SOUTH FLORIDA, INC., respectfully requests that this Honorable Court (i) declare that the Agreement is illusory and thus unenforceable, and (ii) any and all further relief in Plaintiff's favor, including all of Plaintiff's attorneys' fees and costs related to this action, that this Court deems just and proper.

### COUNT IV
### BREACH OF CONTRACT

65.     Plaintiff incorporates by this reference Paragraphs 1 through 29 above as if fully set forth herein and further alleges as follows:

66.     Plaintiff and Defendant entered into the Agreement.

67.     The Agreement provides that all payments due to Plaintiff by Defendant – including but not limited to, all per gallon fees due to Plaintiff for diesel gallons sold, as well as payments for all credit and debit card sales made by Plaintiff and processed by Defendant (not including for diesel fuel sold) -- shall be paid by Defendant within five business days of the date the sales take place.

68.     Since at least 2022, Defendant has routinely failed to pay Plaintiff the full amount of the daily moneys owed it pursuant to the Agreement, delaying full payment of same by well over 5 days and sometimes as much as 30 days, despite Plaintiff having repeatedly complained to Defendant about same. As such, every instance wherein Defendant failed to pay Plaintiff the full amount it owed Plaintiff within the five days required under the Agreement is a discrete breach of the Agreement by Defendant, but more critically still, the fact that Defendant has made it its policy to underpay Plaintiff for "failed transactions" that have nothing to do with Plaintiff in any way

constitutes an ongoing breach of the Agreement being perpetrated *as a matter of practice* by Defendant to this very day.

69.     As a direct and proximate result of Defendant's breaches of the Agreement, Plaintiff has suffered, and continues to suffer, damages.

70.     The Plaintiff has engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable attorneys' fee for which the Defendant is responsible pursuant to Paragraph 30 of the Agreement and F.S. §57.105.

WHEREFORE, Plaintiff, SUNSHINE PLAZA OF SOUTH FLORIDA, INC., demands judgment against Defendant for all of its damages, interest, costs and attorney's fees.

Respectfully submitted,

SANCHEZ-MEDINA, GONZALEZ, QUESADA,
LAGE, GOMEZ & MACHADO LLP
201 Alhambra Circle, Ste. 1205
Coral Gables, FL 33134
Telephone: (305) 377-1000
Telecopier: (855) 327-0391
Email: glage@smgqlaw.com;
       alopez@smgqlaw.com

By: _____/S/_____
        AUGUSTO R. LOPEZ, ESQ.
        Florida Bar No. 45410
        GUSTAVO D. LAGE, ESQ.
        Florida Bar No. 972551



# Exhibit 1

## EQUIPMENT LEASE AND THRU-PUT AGREEMENT

THIS EQUIPMENT LEASE AND THRU-PUT AGREEMENT ("**Agreement**") is made and entered into this 23 day of February, 2011 (the "**Effective Date**"), by and between **PILOT TRAVEL CENTERS LLC** ("**PTC**"), a Delaware limited liability company, having an address of 5508 Lonas Road, Knoxville, Tennessee 37909 and **SUNSHINE PLAZA OF SOUTH FLORIDA, INC.**, a Florida corporation, having an address of 12200 NW South River Drive, Medley, FL 33178 ("**Dealer**").

## RECITALS:

**WHEREAS,** Dealer owns and/or leases the land and owns the buildings and other improvements located at 12200 NW South River Drive, Medley, FL 33178, as described on **Exhibit A** attached hereto (the "**Location**"); and

**WHEREAS,** PTC desires to lease from Dealer those diesel fuel dispensers and related equipment at the Location as depicted on **Exhibit B**, attached hereto, for the services outlined in this Agreement, and Dealer desires to lease the Diesel Fueling System (as defined below) to PTC and to manage the diesel fuel dispensers for PTC. Such management, or thru-put fee, will be paid to Dealer based upon the diesel gallons sold at the Location.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained in this Agreement, the parties hereby agree as follows:

1. **Leased Equipment.** PTC hereby leases from Dealer, and Dealer hereby leases to PTC, all diesel fuel dispensing equipment placed above ground level under the canopy covering the diesel fueling area for over-the-road diesel powered trucks (the "**Diesel Fueling System**") at the Location excluding diesel point of sale equipment (with such exclusion, the "**Leased Equipment**"). At all times during this Agreement, the parties agree that the Leased Equipment is, and shall remain, the sole personal property of Dealer except for diesel fuel dispensers, if PTC replaces them, and such diesel point of sale equipment (the "**Diesel Point of Sale System**"), both of which shall remain the personal property of PTC. In addition, except for improvements, repairs, and replacements made to the Leased Equipment and as specifically described herein, PTC shall hold or possess no right, title, or interest in, to, or under the Leased Equipment. However, any and all improvements, repairs and replacements of the Leased Equipment made by PTC shall be held, possessed, and owned by PTC until the termination of this Agreement, at which time PTC will remove said improvements and return the Location to the same condition as it is at the commencement of this Agreement, normal wear and tear excepted or sell the Leased Equipment to Dealer based on this Agreement. The gasoline islands and the remainder of the Location shall be referred to as the "**Retained Islands**".

2. **Term.** Unless terminated sooner in accordance with the terms hereof, the initial term of the Agreement shall be ten (10) years (the "**Initial Term**"). This Agreement may be extended for four (4) additional five-year terms (each an "**Option**"). Each Option shall be deemed exercised unless either party provides the other party with sixty (60) days prior written

1

notice of the party's intent not to extend this Agreement.  The Initial Term and the Options are referred to herein as the "**Term**."

3.      **Fee Schedule.**  Except as otherwise provided for herein, the thru-put monthly fees paid by PTC to Dealer during the Term as rent for the Leased Equipment shall be as follows:

(a)      $0.17 per gallon each month for the sale of up to and including 131,000 diesel gallons per month ("**Standard Thru-Put Fee**"), plus

(b)      $0.05 per gallon for each diesel gallon sold between 131,001 and 196,500 gallons per month (the "**Tier 2 Base Plus Volume**"), plus

(c)      $0.03 per gallon for each diesel gallon sold in excess of 196,501 gallons per month (the "**Tier 3 Base Plus Volume**").

(d)      In the event that any state, federal, or local government agency (i) passes or enacts any statute, regulation or ordinance that creates, increases, eliminates or reduces any existing Biofuel Tax Credit or creates any other blending tax credit available to PTC; or (ii) imposes a tax or provides for an additional tax credit on Biofuel or other fuel blending or specifically related to the content of motor (road) fuel; or (iii) passes or enacts any statute, regulation or ordinance that requires or limits the use of Biofuel or other blending product (a "Mandate"), and such Mandate results in PTC having to purchase Petroleum Diesel already blended with Biofuel or other additive which would (a) result in PTC not receiving through price reduction or eliminate its claim to a tax credit or (b) create an incentive that would be passed through to PTC by the blender or allow PTC to claim an additional tax credit; or (iv) passes or enacts any statute, regulation or ordinance that modifies the requirements, the components or characteristics of Biofuel or Petrodiesel, or the methodology PTC uses for blending Biofuel or other blending products into Petroleum Diesel (a "Product Specification Change") which would eliminate, create, reduce or increase any tax credit, then the pricing of Section 3(a) and (b) shall no longer apply.  In the event this occurs, the parties agree to meet and mutually agree on a reduced per gallon fee for each diesel gallon sold under Tier 1 Base Volume and the Tier 2 Base Volume. Notwithstanding any of the foregoing, the above provision shall not apply to gasoline sales.

(e)      PTC shall receive any and all tax credits associated with the sale and purchase of diesel fuel at the Location.

(f)      PTC agrees to acquire the diesel fuel existing in underground storage tanks for the Leased Equipment at the Location at the Effective Date.  PTC and Dealer shall multiply the diesel gallons, net of water, at a per-gallon price based upon the Dealer's invoice price, including the cost of hauling, as represented by Dealer's most recent invoices, bills of lading and hauling charges.  Payment for fuel shall be due to Dealer within three (3) business days of presentment of Dealer's last bill of lading.

4.      **Rent Commencement.**  PTC's rent on diesel sales gallons shall commence on the first day that the Diesel Point of Sale System is deployed at the Location (the "**Commencement Date**") and shall be payable for all transactions through the Diesel Point of Sale System that occur at the Location thereafter.

**5.     Rent Payment.**

(a)     Every five (5) business days of the Rent Commencement Date, PTC shall initiate payment via, ACH, to Dealer in an amount equal to:

The number of diesel gallons sold through the Diesel Point of Sale System at the Location during such month times the amounts per gallon specified in the Fee Schedule described in Section 3 above,

PLUS the following amounts accrued during such month: any amount, including sales tax, for Dealer - owned products, PTC Additional Offerings earned at the Location and collected by PTC as described in Section 9, Cat Scale Commissions earned at the Location and collected by PTC as described in Section 11, or PTC's Programs that are collected by PTC that are applicable to the Location, any reimbursement for Pilot Reward redemptions due pursuant to Section 22 of this Agreement, and any reimbursement for cash advances made through third party billing companies at the Location,

LESS the following amounts accrued during such month: any cash received by Dealer for the sale of PTC's diesel fuel; any sale of diesel fuel owned by PTC that is inadvertently recorded in Dealer's point of sale system, any sale of diesel fuel owned by PTC that is sold at the gasoline islands, and any transactions fees associated with Dealer's sales through the Diesel Point of Sale System.

(b)     Within ten (10) business days of the end of each calendar month, Dealer shall provide a final calculation of the amount payable pursuant to the factors set forth in paragraph (a) proceeding for such month.  Said reconciliation shall also include reimbursement by Dealer of any percentage of third party fees for sales of Dealer products sold through the Diesel Point of Sale System during such month as provided in Section 3 and/or 18 and for any charge-backs and/or thefts arising from Dealer's gross negligence or willful misconduct.   Any net overpayment or underpayment to either party shall be settled by payment within  three (3) business days after the Dealer provides the reconciliation, except with respect to any amount that PTC disputes.  The parties shall promptly resolve any such dispute pursuant to Section 28 below. PTC shall give Dealer reasonable notice of any charge-back or theft which PTC claims arose from the gross negligence actions or willful misconduct of Dealer.

(c)     PTC may withhold any sum due to Dealer by PTC or by any of its affiliates, in connection with this Agreement or in connection with any other matter or agreement, and apply such sum directly as a set-off against Dealer's indebtness to PTC or to any of its affiliates at any time.  PTC, shall provide to Dealer a written itemized report pertaining to any such set-offs no less than ten (10) days prior to PTC deducting any such sums.

**6.     Audit Rights.**  Each party shall have the right, upon ten (l0) business days notice to the other party, to audit the other party's records in a reasonable period of time so long as the time period does not unreasonably disrupt the audited party's normal business or accounting operations.  The records to be audited shall be limited to all records relating to each type of transaction, transaction fees and payment calculations as contemplated in this Agreement.  The audited party shall deliver any such records by electronic means, overnight mail or courier. In the event that said delivery of such records would be unduly burdensome, then the audit shall be

conducted during normal business hours at the audited party's headquarters.  In the event an audit for a given period discloses an underpayment in favor of the audited party equal to or more than three percent (3%) of the aggregate thru-put fees for such period, or in the event the audits in a given calendar year disclose a cumulative underpayment in favor of the audited party of three percent (3%) or more of the aggregate thru-put fees for such year, the audited party shall promptly reimburse the auditing party for the cost of the audit.  Any underpayment, regardless of the percentage, found during an audit will be paid by to the auditing party within ten (10) business days of receipt of the auditing party's invoice.  The parties also agree to settle any overpayment found during an audit by payment within ten (10) business days of completion of such audit.

   7.   **Dealer's Obligations.** Dealer agrees to the following obligations and responsibilities:

   (a)   Dealer shall make all reasonable efforts to maintain the Location in a neat, orderly and clean condition.

   (b)   Except for any and all taxes imposed on the sale of diesel fuel sold through the Diesel Point of Sale System or other revenue through PTC's point-of sale-equipment, which is solely for the benefit of PTC, Dealer shall be liable for any and all local, state and federal taxes due and owing for sales made at the Location or  rent paid at the Location and  agrees to indemnify PTC for Dealer's failure to pay any said taxes, including but not limited to all sales of diesel fuel made to vehicles on the retained islands if the Location does not have a separate diesel tank.

   (c)   Dealer will use its best efforts to staff the Location with qualified personnel to perform transactions through either pay-at-the-pump or at the fuel desk counter inside the facility.  Dealer will retain the sole authority and responsibility for all employees, agents, contractors and representatives required by Dealer to conduct the operation of, or otherwise relating to, the Location ("Staff") with respect to all matters, including, without limitation, Worker's Compensation, Unemployment Insurance, Income Tax, United States Pension Plan contributions, Union Dues, Health and Welfare Benefits, Goods and Services Tax, notice and severance obligations upon termination, and all other legal obligations in this regard.

   (d)   Dealer will honor those credit cards and other arrangements identified on **Exhibit C** as it may be amended by PTC, in its sole discretion, including, but not limited to, third party billing company cards for payment of fuel and other goods and services as may be arranged by PTC and Dealer.

   (e)   Dealer will honor discounts and cost plus programs to PTC direct bill customers in accordance with such customer's current discount or cost plus program as amended from time to time by PTC.

   (f)   Dealer agrees to operate the Location twenty-four hours a day, seven days a week on an annual basis.

   (g)   Dealer will collect the necessary information for PTC's transactions and convey the same to PTC in a timely manner.

(h)     Dealer shall perform all required functions and documentation associated with third party billing company cash advances and will be reimbursed by PTC for such advances as agreed to in this Agreement.   Dealer shall keep all paperwork for a minimum of three (3) years.

(i)     Dealer shall set the retail diesel price of the diesel fuel sold through the Location as directed by and at the sole discretion of PTC's Corporate Headquarters personnel within sixty (60) minutes of appropriate notification and as instructed in the handbooks and manuals given to Dealer by PTC.  PTC shall have the sole right to interpret the handbooks and manuals provided.

(j)     Dealer shall supply and be responsible for the utilities servicing the Location and the Leased Equipment.

(k)     Unless otherwise provided herein, Dealer shall be responsible for the maintenance of the canopy, the USTs and fuel lines of the Diesel Fueling System, the areas around the diesel facilities, including the concrete under the canopy area and surrounding premises, and the general cleaning and overall safety of the area under the canopy and surrounding premises.

(l)     Dealer shall be responsible for the operation of the entire Location throughout the Term.  Dealer will be responsible for the purchase and stocking of supplies at the diesel islands, including but not limited to paper towels, washer fluid, window washers, receipt paper, trash cans, trash bags, and anything else that is considered essential by PTC for the management of the diesel islands after the initial set-up, which shall be paid for by PTC.

(m)     Dealer agrees to notify PTC within thirty (30) minutes of discovery any major problems, spills, repairs or maintenance needed on the Leased Equipment.  All other problems, repairs or maintenance issues shall be reported to PTC under PTC's standard repair and maintenance reporting system as instructed in the handbooks and manuals given to Dealer by PTC.  PTC shall have the sole right to interpret the handbooks and manuals provided.  PTC shall commence repairs, maintenance and/or replacement of any Leased Equipment within a commercially reasonable time, in conformance with industry standards and customs.

(n)     Dealer agrees to perform any remediation for any Environmental Contamination discovered during the installation of PTC's equipment or at any other time during the Term of this Agreement.  For purposes of this Agreement, **"Environmental Contamination"** shall mean the presence on or below the surface of the Property of Hazardous Substances, as defined in local state or federal laws, in excess of applicable local, state, or federal remediation or cleanup levels in effect at the time this Agreement is entered into and which are covered by the Agreement, or the presence off of the Property in any concentration of Hazardous Substances which are flowing or migrating from or have flowed or migrated from the Property.  PTC shall not be liable for the cost of said remediation unless the environmental contamination was directly caused by the gross negligence or willful misconduct of PTC, its agents or representatives, or the malfunctioning or failure of equipment which is installed and owned by PTC.  Dealer agrees not to unreasonably delay performing said remediation or impede PTC's ability to sell fuel at said Location during the remediation.  If Dealer unreasonably delays performing said remediation or PTC's ability to sell diesel fuel at said Location during the remediation, and the environmental contamination was not caused by PTC, its agents or representatives, then Dealer agrees to waive the thru-put fee requirements under Section 3 above for said Location during the period of delay.

5

(o)     Dealer shall use its best efforts to ensure all of PTC's policies and procedures, which are used at other PTC stores for its equipment and programs, are followed.

(p)     Dealer agrees to properly post and display and honor PTC's cash versus credit retail diesel pricing as instructed by PTC, but shall not be liable for complying with applicable laws and regulations so long as the cash versus credit retail diesel pricing is followed by Dealer. PTC agrees to indemnify and hold harmless Dealer for any loss or cost it may incur from violation or failure to comply with any applicable laws or regulations relating to the cash versus credit retail diesel pricing to which Dealer may be subjected from following PTC's procedures. Dealer agrees to immediately notify PTC of any notice of violation or warning.

(q)     Dealer shall be responsible for the payment of any real or personal property taxes, and any assessments against the real and personal property for any capital improvement made under this Agreement that is levied or assessed against the Location.

(r)     In the event the Location is leased by Dealer, Dealer will warrant and indemnify and hold harmless PTC from any loss or cost it may incur by reason of a claim by the lessors of the Location that their consent is required for Dealer to lease the Location under this Agreement as required by Dealer's Lease Agreement(s) and that all underlying Lease Agreements Terms extend beyond the term of this Agreement, if any.

(s)     Dealer agrees to maintain the good name of PTC and their respective affiliates, and meet and abide by the site image, service quality standards and branding specifications as set out in the respective standards manual of such entities provided to Dealer from time to time (as amended from time to time by such parties, the "Manual(s)").   Failure to abide by this Section will be considered a breach of this Agreement.

**8.     PTC's Responsibilities.**     PTC agrees to the following obligations and responsibilities:

(a)     Unless otherwise provided herein, PTC shall responsible for all costs and expenses necessary to construct and install the Capital Improvements, Leased Equipment and Additional Offerings made to the building and/or premises at the Location.  Upon execution of this Agreement, PTC shall provide a written itemized estimate of all such improvements, equipment and offerings, including labor and all other costs referenced in Section 9 (c) of this Agreement.  Furthermore, PTC shall provide Dealer with a final schedule of values for all improvements, equipment, offerings and labor provided pursuant to this Agreement which shall be included in the amortized items subject to reimbursement pursuant to Section 9 (c) of this Agreement.  In addition, PTC shall perform and be responsible for the repairs and yearly maintenance on the Leased Equipment.

(b)     PTC agrees to keep the Leased Equipment in good working order and in legal and environmental compliance throughout the Term as applicable pursuant to the Agreement; provided, however that Dealer shall be responsible for the routine day to day cleaning and repairs of the dispensers that can be performed by Dealer's employees.

(c)     PTC shall be responsible for the cost of installing and de-installing any and all approved Marks at the Location.

(d)     Dealer and PTC shall agree, in advance, to the location(s) of the Leased Equipment to be setup and installed. PTC is responsible for all permits and costs associated with the set up and installation of the Leased Equipment, excluding remediation required due to the discovery of environmental contamination so long as the environmental contamination was not initially caused by PTC, or its agents, contractors, representatives, contractors, or suppliers. Dealer shall be required, at its expense, to complete any modifications to its driveway and parking lot(s) necessary for PTC's installation and setup of the Leased Equipment, including the moving of the main power transformer, prior to PTC's setup and installation. In the event that Dealer cannot obtain the necessary permits and/or approvals from any applicable government agency to complete said modifications, then this Agreement shall terminate.  PTC agrees that any movement of the Leased Equipment shall require the approval of Dealer, which approval shall not be unreasonably withheld, conditioned, or delayed.

(e)     PTC will be responsible for any cost associated with the replacement and additional maintenance associated with the set-up of the diesel islands that occur through ordinary wear and tear.

(f)     PTC shall be responsible for the hauling and delivery of diesel fuel to the Location for PTC and Dealer's benefit and use.

(g)     Prior to the Commencement Date for the Location, PTC shall train the staff at the Location on the operation of the PTC equipment and PTC programs, and provide reference manuals on PTC policies and procedures for Dealer's employees.  Dealer shall be responsible for the continual training and the assurance that each new employee is properly trained thereafter.

(h)     PTC shall be responsible for the installation of its required equipment for the Diesel Fueling System at the Location, which shall entail: (a) the Diesel Point of Sale System equipment and fuel controlling devices and (b) Warren Rodgers system; if not already installed.

(i)     PTC agrees to pay and indemnify Dealer for any and all diesel fuel sales taxes or motor fuel taxes or any other tax associated with the sale of diesel fuel through the Diesel Point of Sale System, except for those sales made on Dealer's Retained Islands if the Location has only one (1) diesel tank.  Dealer shall be responsible for all sales generated at the Retained Islands, which shall be reconciled pursuant to Section 5 of this Agreement.

(j)     If applicable, PTC agrees to abide by the terms and conditions of the underlying lease agreement(s) for the Location (a copy of which Dealer has provided to PTC), as they exist at the execution of this Agreement and agrees to reasonably cooperate with Dealer regarding any changes made to the underlying lease so long as said change(s) do not materially affect or impact PTC's rights under this Agreement or require PTC to incur any unreimbursed expense.

(k)     The parties acknowledge that Dealer will be required to incur significant expense to prepare the Location for the Capital Improvements and Equipment to be constructed and installed by PTC, pursuant to this Agreement.  PTC agrees to reimburse Dealer for fifty (50%) percent of said documented costs; provided however, in no event shall the amount of reimbursement exceed $50,000.00.  PTC shall remit said payment(s) to Dealer within fifteen (15) calendar days of written notice of the amount of said expenses.

7

9.     **PTC Additional Offerings and Capital Improvements.**

(a)     In addition to the above, Dealer agrees that PTC may install, at its option and upon the approval of Dealer, which approval shall not be unreasonably withheld, conditioned, or delayed, capital improvements and those items which PTC determines are necessary to have associated with the PTC brand ("**Additional Offerings**"). PTC shall be responsible for any and all costs associated with the capital improvements and Additional Offerings and they shall remain with the Location following the termination of the Agreement unless any Additional Offering is equipped with enhancements that are licensed from third parties and those licenses are not transferable to Dealer.

(b)     At the termination of the Agreement, Dealer shall reimburse PTC for the unamortized portion of the full cost (including installation costs and sales and use taxes) of the capital improvements and Additional Offerings.  Dealer shall not be responsible to reimburse PTC for those capital improvements or Additional Offerings that include PTC Marks.

(c)     Capital improvements and Additional Offerings made to the building and/or premises at the Location shall be reimbursed to PTC within thirty (30) days of the termination or expiration of this Agreement, under the following amortization periods:

(i)     Building Improvements – 20 Years (including shower installations)
(ii)    Land Improvements – 10 Years (pavement / concrete work that is capitalized)
(iii)   Equipment – 5 Years (primarily dispensers and fuel blending equipment)
(iv)    Electronic Equipment – 5 Years (point -of -sale equipment, computers, kiosks, etc.)

(d)     Nothing in this Agreement shall prevent Dealer from making any of its own offerings, improvements, or capital improvements to the Location so long as the offering, improvement or capital improvements do not unreasonably prohibit access to the Leased Equipment, compete with PTC's offerings or detract from the provisions set forth in Section 7(t). Should any improvement, construction, or required repair at the Location by either party require any equipment or access to the Location be temporarily closed, each party agrees to notify the other party as soon as reasonably possible and to work in a way that causes minimal disruption to the other's business efforts at the Location.  In the event that the disruption is caused by Dealer and the monthly volume falls below the Tier I Base Volume Gallons, there will be a proportionate abatement of the Minimum Monthly Thru-Put.

(e)     PTC operates multiple units in the United States and purchases large quantities of goods and services in connection therewith.  As a result thereof, PTC may from time to time develop or obtain commercial relationships with its vendors and suppliers which may assist Dealer in obtaining like or similar goods and services at discounted prices.  Pursuant thereto, PTC agrees, at its reasonable discretion, to undertake commercially reasonable efforts to assist Dealer, and Dealer agrees to participate in, the following PTC programs:

(i)     PTC's Coffee Program.  Dealer agrees to only purchase and brew PTC pre-approved coffee packages at its deli bar.  Dealer may purchase, brew and sell any espresso coffee of its choice.

(ii)     DAS Vendor Program.  Dealer agrees to participate in PTC's DAS vendor program or any replacement program generally in use at diesel fuel sales locations owned and operated by PTC and its affiliates with respect to purchases for resale from the Diesel Fueling Island.

(iii)    Check Cashing.  Dealer shall not charge a check cashing fee for any check under $200, on the first check, so long as the customer presenting the check has acquired at least twenty-five (25) gallons of diesel fuel from PTC.  Thereafter, Dealer shall charge a three percent (3%) charge on all checks for fueling customers with purchase of 25 gallons or more.  Dealer shall charge all non-fueling customers three percent (3%) of the face value of the check.  Dealer shall not process any checks or cash advances greater than $1,000 through PTC's point of service check cashing system.  Dealer shall be allowed to keep all revenues from the check cashing program.  Dealer shall be responsible for obtaining and maintaining all check cashing permits and agree to abide by and follow all check cashing regulations, ordinances, statutes, and laws.

(iv)     Showers: Dealer shall charge ten dollars ($10) per shower or honor a shower credit; which is earned with the purchase of fifty (50) gallons or more good for five (5) days (or as may be amended from time to time by PTC's Loyalty Program). Dealer shall be allowed to keep all net revenues from the shower program.

(v)      Fax.  Dealer shall charge two dollars ($2) per page faxed from the Location.  Dealer shall be allowed to keep all revenues from the facsimile program.  Dealer shall be responsible for purchasing, installing and maintaining all PTC required facsimile machines, at Dealer's sole cost and expense.

(vi)     Copy. Dealer shall charge twenty five cents ($0.25) per page copied at the Location.  Dealer shall be allowed to keep all revenues from the copy program.  Dealer shall be responsible for purchasing, installing and maintaining all PTC required copy machines, at Dealer's sole cost and expense.

(vii)    Challenge Magazine. Pilot Challenge Magazine offers the professional driver many discounts, informative articles on their profession and industry, and the location guide. Dealer agrees to purchase from PTC and sell to its customers the Pilot Challenge Magazine at a price set by PTC.

The above fees and charges for Sections 9(e)(i)-(vii) are subject to change at any time with five (5) business days prior written notice by PTC to Dealer.

Dealer shall have the right to participate in all applicable PTC retail programs including purchasing, retail services and food offerings, if available, including without limitation those listed in **Exhibit E** and other programs PTC offers.  Dealer sh all incur any and all costs associated with set up and the acquisition costs of any purchased materials at the Location.

Notwithstanding the foregoing, (i) PTC expressly does not guarantee or represent that such assistance will result in any discounting or more favorable pricing (it being acknowledged that such vendor pricing is and shall at all times remain in the exclusive discretion of the vendor), (ii) no term or provision herein shall be construed to require that PTC make any purchases for

9

Dealer, or on Dealer's behalf or for Dealer's benefit, and (iii) no term or provision herein shall be construed or deemed to require that PTC disclose to Dealer, or otherwise offer Dealer access to its own pricing structure with such vendors.

Finally, to insure the success of the PTC Retail Programs installed at the Location, PTC may provide advice or assistance to enhance the performance of these various programs.  In addition, PTC reserves the right to terminate these programs if any non-compliance by Dealer is not remedied within thirty (30) calendar days of any such prior written notice; or if PTC finds, in its sole discretion, that these Retail Programs are not up to PTC's standards.

(f)     Promotions.  In connection with Dealer's business at the Location, Dealer agrees to participate, at Dealer's own cost and expense, in promotions offered by PTC at its Location, as directed by PTC from time to time, and Dealer agrees to use its best efforts to ensure that promotions are properly executed and promotional material is displayed to its best advantage.

10.     **Trademark License Agreement and Signage.**  Dealer and PTC agree to grant each other the non-exclusive license (with no right to sub-license, unless specifically authorized in writing by the other) to use the other's trademarks identified on **Exhibit D** (attached hereto and incorporated herein by reference) and as periodically amended, supplemented or revised by the other party in its sole discretion ("**Marks**") so long the Marks are used in conjunction with the terms and conditions hereinafter set forth.  Dealer agrees that PTC shall have the right to place its signage at the Location in areas agreed upon by PTC and Dealer.  Nothing in this Agreement shall give the other party any right, title or interest in the Marks to the other party.

11.     **CAT Scale Agreements.**  Dealer agrees to allow PTC to enter into a new CAT Scale Agreement for the Location. Dealer agrees to provide all documentation, consents and approvals as reasonably requested by PTC and CAT Scale to enter into such new CAT Scale Agreement.  All charges for use of the CAT Scales at the Location will be charged through the Diesel Point of Sale System.  PTC agrees to pay Dealer forty-five percent (45%) of the weekly gross scale revenue collected, through the settlement of fees as detailed in Section 5 of this Agreement.

12.     **Transflo System.**  PTC reserves the right, but not the obligation, to purchase Pegasus Transflo Equipment and Dealer agrees to maintain, properly utilize and solely use said equipment at PTC's direction.  PTC agrees to pay Dealer $0.05 per page scanning fee at the Location pursuant to this Agreement and so long as PTC's agreement with Transflo and the fees PTC collects/charges do not change.  If the rates/charges due change, the parties will negotiate in good faith to agree on a new scanning fee.

13.     **DEF Equipment.**  PTC reserves the right, but not the obligation, to install and sell certain technology that helps reduces exhaust emissions produced by trucks during their consumption of diesel fuel which is accomplished through a process in which a special fluid known as Diesel Exhaust Fluid ("DEF"). DEF will be dispensed into commercial trucks in the same manner as diesel fuel via a DEF Mini Bulk Dispensing Unit (a "Unit" or "Units").  PTC shall own the equipment, be entitled to encumber the equipment, and retain all profits and revenue generated by the sale of this product; provided however, PTC agrees to pay Dealer $0.05 per gallon sold.

**14.    ATM.**  PTC reserves the right, but not the obligation, to install and Dealer agrees to utilize only PTC approved ATM vendor(s) in either one or two locations an Automated Teller Machine ("ATM") at the Location. PTC agrees to pay Dealer fifty percent (50%) of the weekly gross revenues collected, through the settlement of fees as detailed in Section 5 of this Agreement and will be forwarded to Dealer within five (5) business days of receipt by PTC.

**15.    Liens and Encumbrances.**  Except as stated herein, the parties agree not to allow the Location, at any time during the term of this Agreement, to become subject to any lien, charge, or encumbrance that prevents a party from freely operating its business at the Location as contemplated by this Agreement, and to indemnify each other against all other liens, charges, and encumbrances.   In addition to the foregoing, if any construction lien or other lien, attachment, judgment, execution, writ, charge or encumbrance is filed against the Location or the leasehold, the Leased Equipment or any alterations, fixtures or improvements therein or thereto, as a result of any work  action or  inaction  done by or at the  direction of PTC or any of PTC's Agents, PTC will discharge same of record or bond the lien within thirty (30) days PTC receives notice of the filing thereof.

**16.    Insurance.**  Dealer and PTC agree to maintain the following insurance at the Location:

(a)    Fire and Extended Coverage:  Dealer agrees to insure and keep insured, at its sole cost, the property and improvements on the Location against loss or damage by fire or other hazards normally covered by standard fire and extended coverage policies for not less than 100% of their replacement value.

(b)    General Liability Coverage:  Dealer and PTC shall each obtain and keep in force General Liability Insurance (excluding products liability and pollution and/or environmental liability) against claims or suits for bodily injuries, including death therefrom, and property damage, arising out of its maintenance, operation or use of the Location, and caused by the alleged negligence or other misconduct of the insured or any of its employees, agents, representatives and contractors in an amount not less than a single limit of liability of $2,000,000 per occurrence.

(c)    Product Liability:  Dealer and PTC shall obtain and keep in force, at the insured's expense, for the benefit of the insured and the additional insured, product liability insurance, including death therefrom and property damage, arising out of the sale of products from the Location in an amount not less than a limit of liability of $2,000,000 per occurrence.

(d)    Worker's Compensation:  Dealer further agrees to obtain and keep in force, at its own expense, Worker's Compensation Insurance against claims by its employees who sustain bodily injury while in the course of and within the scope of, their employment at the Location, in accordance with the provisions of the Locations Worker's Compensation state laws or similar laws.

(e)    Employer's Liability:  Dealer further agrees to obtain and keep in force, at its own expense, Employer's Liability Insurance against claims by its employees in an amount that is not less than $1,000,000 dollars for each injury or each disease.

11

(f)　Additional Insureds:  Dealer shall name PTC, and PTC shall name Dealer, as an additional insured, without limitation, as their interests may appear, under the insured's liability insurance policies required under this Agreement (other than those providing Worker's Compensation and Employer's Liability insurance).

(g)　Insurance Companies: Dealer and PTC shall maintain all insurance with solvent insurance companies licensed in the state where the Location is based with no less than an "A-" financial rating and size category of "IX" as set by Best's Key Rating Guide.

(h)　Certificates of Insurance: Dealer and  PTC shall exchange a certificate of all insurance and of renewals prior to the commencement of operations and as required by PTC or Dealer annually or from time to time during the term of this Agreement.  Each policy shall contain a provision that it may not be canceled or its limits reduced except by payment of claims, without the insured providing thirty (30) days' prior written notice to the other party.

(i)　Subrogation Waiver:  Any insurance policies maintained by Dealer or PTC, which pertain to this Agreement shall contain standard waiver of subrogation clauses that conform to the indemnification provisions in this Agreement.

(j)　If Dealer fails to fulfill these obligations pursuant to Section 16, PTC may purchase the insurance as required hereunder and charge the costs to Dealer (together with a processing charge of twenty percent (20%) of the cost of the insurance), or PTC may suspend or terminate this Agreement forthwith upon notice pursuant to Section 26.

17.　**Permits.**  Dealer shall be solely responsible for obtaining and paying for all appropriate and necessary permits for the Location from any state, federal, or local agency; including but not limited to UST and NPEDS permits and fees. In addition, Dealer agrees to belong, maintain and stay in full compliance of any applicable UST Funds. Dealer agrees to indemnify and hold harmless PTC for any violation or failure to obtain and maintain any state, federal, or local agency permit. PTC agrees to fully cooperate with Dealer in assisting to obtain such permits, at no cost to PTC.  Notwithstanding any of the foregoing, PTC shall be solely responsible for obtaining and paying for all appropriate and necessary permits for the Location from any state, federal, or local agency; including but not limited to building, FDEP, FDOT, SFWMD, UST and NPEDS permits and fees, as it relates to the set up, installation and/or replacement of the Leased Equipment.

18.　**Transaction fees.**  PTC shall pay for and be responsible for all outside transaction fees associated with PTC's sales from the Location for the services provided by PTC, including, but not limited to, all transaction fees or credit card fees required to process diesel fuel purchases as well as all Federal, state and local taxes for each gallon of fuel sold, including delivery costs to Dealer's location and Third Party Billing Company transaction fees.  Dealer shall be responsible for all inside transaction fees related to Dealer's sales and activities which occur inside the store and activities related to facility revenue agreements.  In addition, Dealer agrees to pay PTC for the fee amount charged to PTC by the Third Party Billing Companies listed on **Exhibit C** for all Dealer sales which occur through the Diesel Point of Sale System, both inside and outside the Location, as well as any PTC Program that benefits the Dealer**.**  PTC covenants and warrants that PTC will only pass through to Dealer the same fee then charged to PTC by the Third Party Billing Company.

12

19.     **Compliance with Law.**   Dealer and PTC agree to comply with any and all applicable laws, regulations, or codes affecting this Agreement and the Location.

20.     **Indemnity.**

(a)     DEALER AGREES TO PROTECT, INDEMNIFY, HOLD HARMLESS, AND DEFEND PTC, ITS SUBSIDIARIES AND AFFILIATED COMPANIES, AND THE OFFICERS, DIRECTORS, MANAGERS, MEMBERS, EMPLOYEES, WORKMEN, AGENTS, SERVANTS AND INVITEES OF PTC, ITS SUBSIDIARIES AND AFFILIATED COMPANIES, FROM AND AGAINST ALL LOSSES, DAMAGES, DEMANDS, CLAIMS, SUITS AND OTHER LIABILITIES, INCLUDING REASONABLE ATTORNEY FEES AND OTHER EXPENSES OF LITIGATION ON OR DEFENSE  ASSERTED BY THIRD PARTIES (ALL HEREINAFTER REFERRED TO AS "**CLAIMS**"), BECAUSE OF:

(i)     BODILY INJURY, INCLUDING DEATH AT ANY TIME RESULTING THEREFROM, AT THE LOCATION, UNLESS CAUSED BY PTC'S EMPLOYEE'S, AGENTS', CONTRACTORS' OR REPRESENTATIVES' NEGLIGENCE OR WILLFUL MISCONDUCT;

(ii)     EXCEPT FOR THOSE MATTERS WHICH ARE CAUSED BY PTC'S EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES NEGLIGENCE OR WILLFUL MISCONDUCT, ALL ENVIRONMENTAL CLAIMS OF ANY NATURE IN CONNECTION WITH THE LOCATION OR DEALER'S MANAGEMENT OF THE LOCATION;

(iii)     A BREACH BY DEALER, ITS EMPLOYEES, WORKMEN, AGENTS, SERVANTS, OR VENDORS, OF ANY TERM, PROVISION OR WARRANTY CONTAINED HEREIN;

(iv)     EXCEPT FOR THOSE MATTERS WHICH ARE DIRECTLY CAUSED BY PTC'S EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES NEGLIGENCE OR WILLFUL MISCONDUCT, ANY ENVIRONMENTAL CONTAMINATION WHICH OCCURS EITHER ON OR OFF THE LOCATION;

(v)     FAILURE TO PAY ANY AND ALL TAXES ASSOCIATED WITH THE BUSINESS AND LOCATION, EXCEPT FOR ANY AND ALL TAXES IMPOSED ON THE SALE OF DIESEL FUEL SOLD THROUGH THE DIESEL POINT OF SALE SYSTEM OR OTHER REVENUE THROUGH THE DIESEL POINT OF SALE SYSTEM FOR THE ACCOUNT OF PTC;

(vi)     ANY VIOLATION OF LAW, ORDINANCE, BY-LAWS, REGULATIONS, STATUTES OR OTHER LEGAL REQUIREMENTS AT THE LOCATION NOT CAUSED BY PTC'S EMPLOYEE'S,

AGENTS', CONTRACTORS' OR REPRESENTATIVES' NEGLIGENCE OR WILLFUL MISCONDUCT;

(vii) DEALER'S FAILURE TO PERFORM ALL OF ITS OBLIGATIONS SET FORTH IN THIS AGREEMENT;

(viii) ANY CLAIMS, DAMAGES, LOSSES, JUDGMENTS, FINES, LIABILITIES, OR OTHER DETRIMENT ARISING FROM OR RELATING TO THE EMPLOYEES AT THE LOCATION; AND

(ix) ANY TORTIOUS INTERFERENCE CLAIM OR SIMILAR ACTION INVOLVING ANY AGREEMENT DEALER HAS ENTERED INTO PREVIOUSLY WHICH THIS AGREEMENT IS ALLEGED TO HAVE VIOLATED, IF ANY.

(b) PTC AGREES TO PROTECT, INDEMNIFY, HOLD HARMLESS AND DEFEND DEALER, ITS SUBSIDIARIES AND AFFILIATED COMPANIES, AND THE OFFICERS, DIRECTORS, MANAGERS, MEMBERS, EMPLOYEES, WORKMEN, SERVANTS AND INVITEES OF DEALER, ITS SUBSIDIARIES AND AFFILIATED COMPANIES, FROM AND AGAINST ALL LOSSES, DAMAGES, DEMANDS, CLAIMS SUITS AND OTHER LIABILITIES, INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER EXPENSES OF LITIGATION OR DEFENSE ASSERTED BY THIRD PARTIES (ALL HEREINAFTER REFERRED TO AS "CLAIMS"), WHICH OCCUR, DIRECTLY IN CONNECTION WITH OR BY REASON OF PTC'S OR ITS EMPLOYEES, WORKMEN, AGENTS, SERVANTS, OR VENDORS NEGLIGENCE OR WILLFUL MISCONDUCT OR ARISING OUT OF A BREACH BY PTC OF ANY OF TERM, PROVISION, AGREEMENT, REPRESENTATION, OR WARRANTY CONTAINED IN THIS AGREEMENT, OR ATTRIBUTABLE TO THE PRODUCTS SPECIFIED OR REQUIRED BY PTC THAT ARE BLENDED WITH DIESEL OR THE NEGLIGENCE OR WILLFUL ERRORS, ACTS OR OMISSIONS OF PTC, ITS AGENTS, OFFICERS, EMPLOYEES OR REPRESENTATIVES, AND THE FAILURE TO PAY ANY AND ALL TAXES IMPOSED ON THE SALE OF DIESEL FUEL THROUGH THE DIESEL POINT OF SALE SYSTEM OR OTHER REVENUE THROUGH THE DIESEL POINT OF SALE SYSTEM FOR THE ACCOUNT OF PTC; EXCEPT FOR THOSE MATTERS WHICH ARE CAUSED BY DEALER'S EMPLOYEES', AGENTS', CONTRACTORS' OR REPRESENTATIVES' GROSS NEGLIGENCE OR WILLFUL MISCONDUCT;.

(c) THE PARTY SEEKING INDEMNIFICATION SHALL PROMPTLY NOTIFY THE INDEMNIFYING PARTY IN WRITING OF ANY CLAIM, AND THE INDEMNIFYING PARTY SHALL AT ALL TIMES HAVE THE RIGHT TO DEFEND, SETTLE OR COMPROMISE SUCH CLAIM WITH COUNSEL OF ITS OWN CHOOSING AND IN SUCH MANNER AS IT MAY DEEM ADVISABLE.

**21.     Non-Solicitation or Hire.**  Throughout the Term and for a period of two (2) years following the termination of the Agreement, neither Dealer nor PTC shall solicit or hire any current employee of the other unless consented to in writing by the current employer.

**22.    PTC Reward Points Program.**    Dealer shall accept PTC's Driver Rewards Program at the Location.  PTC shall reimburse Dealer, as reconciled in the reimbursements in Section 5, seventy-five percent (75%) of the retail price of those items purchased at the Location through PTC's Driver Rewards Program.  Dealer agrees and acknowledges that PTC's Reward Program includes free showers to customer's purchasing at least fifty (50) gallons in one fueling transaction, which Dealer agrees to honor and not charge PTC for said showers.

**23.    Right of First Refusal.**    If Dealer receives a bona fide offer to purchase, its interest in the Location from a third party (excluding a person or entity that is or is directly or indirectly controlled by one or more members of the family that controls Dealer or a trust for the benefit of any such person) that it intends to accept, it will give notice to PTC of the identity of the offeror and a complete and accurate copy of the written offer.  PTC will have thirty (30) calendar days to assess the offer and determine if PTC will acquire the Location for the price and terms contained in the offer.  If PTC relinquishes its right to acquire the Location, then Dealer may only sell the Location to the offeror under the same material terms and conditions as presented to PTC.  Dealer must assign this Agreement to the new owner under the same terms and conditions contained in this Agreement.  Except for immaterial changes in the offer, (e.g.. a minor change in the closing date), Dealer must present any amended terms to PTC and allow PTC twenty (20) calendar days to accept the amended offer.  If Dealer sells the Location after PTC relinquishes PTC's option right, Dealer, at the request of PTC, shall confirm and provide written proof of the lack of any material change to the offer as last presented by Dealer. If Dealer fails to so confirm the lack of any material change, PTC shall have the right to sue Dealer for specific performance, pursuant to the terms of the offer last presented to PTC. Should PTC prevail in its suit for specific performance, the parties shall close said purchase and sale within thirty (30) calendar days.

**24.    Environmental.** Except as otherwise provided herein, Dealer shall be responsible for any and all environmental compliance and/or contamination now existing or arising from the operation of the Diesel Fueling System on the Location. Dealer agrees to conduct all environmental remediation promptly upon notification and shall not unreasonably interfere with the normal course of business.  The parties agree that each shall cooperate to have any environmental matter covered by the Location's appropriate UST Fund but that Dealer shall be the registered user of the USTs and be responsible for any and all fees associated with the registration and testing of the USTs during the entire term of the Agreement.  Dealer shall also be responsible for all environmental matters occurring prior to, during and after the Commencement Date of this Agreement, regardless of when discovered, except for those matters which are caused by PTC's employees, agents', contractors' or representatives' gross negligence or willful misconduct.

**25.    Right of Access.**    Throughout the Term, Dealer shall grant PTC a non-exclusive license to enter upon the Location to perform its obligations described in the Agreement, to inspect the property for full compliance of this Agreement, and to ensure that the facility is being operated to PTC's standards.  Unless otherwise provided herein, the right of access shall terminate upon the termination of this Agreement and access to the Location shall be limited to the purpose of removing all PTC brand names, advertising, and fixtures, which shall be completed within ten (10) business days of the date this Agreement terminates.

26.    **Termination.**

(a)    This Agreement may be terminated by a party only for the reasons set forth below, by giving the other party thirty (30) calendar days prior written notice, unless otherwise specified, outlining the reasons for termination subject to the parties right to cure:

(i)    Bankruptcy.  If either party files a petition of bankruptcy or makes a voluntary assignment for the benefit of creditors or if a petition in bankruptcy is filed against a party and not dismissed within sixty (60) calendar days after the filing thereof, or in the event of a bankruptcy, the bankruptcy court does not approve of this Agreement;

(ii)    Material Breach.  If one party has materially breached any term or condition of this Agreement and has failed to cure such breach within thirty (30) calendar days from receipt of the written notice of breach or, if the breach is not capable of being fully cured within such thirty (30) day period (for example, remediation of an environmental condition), has failed to initiate appropriate curative efforts within such thirty (30) day period or thereafter to pursue them with due diligence until the breach is cured in all material respects; the other party may terminate this Agreement.  A material breach shall also include the Dealer operating the facility at standards below PTC's requirements, which shall be determined in PTC's sole discretion;

(iii)    Third Party Billing Company.  In the event a Third Party Billing Company, which is an integral part of PTC's ability to perform the terms and conditions of this Agreement: (1) terminates its agreement with PTC, (2) changes the terms and conditions of the Third Party Billing Agreement which adversely affects the feasibility of this Agreement for PTC, or (3) does not allow for the transactions to occur as outlined in this Agreement, then PTC agrees to notify Dealer and the parties agree to immediately re-negotiate the Fees in Section 3 above.  If the parties are unable to agree on new Fees within thirty (30) days of notification of said change, then PTC may terminate this Agreement upon notice to the other.  This provision shall not be effective during years 1 through 5 of the Initial Term of this Agreement;

(iv)    Abandonment/Termination of Location.  If Dealer at any time ceases to manage the Location under the Dealer name and brand, abandons the Location, or its rights in the Location terminate, or if Dealer otherwise breaches its lease of Location, or otherwise forfeits the right to do or transact business in the jurisdiction where the Location is located, PTC shall have the immediate right to terminate this Agreement upon written notice to Dealer;

(v)    Unauthorized Use of Marks.  If either party misuses or makes any unauthorized use of other party's Marks or any other identifying characteristics of the services, fails to adhere to the other party's guidelines regarding use and display of the other's name and Marks, or otherwise materially impairs the goodwill associated therewith or the other party's rights therein and has failed to correct such misuse, unauthorized use, failure, or impairment within five (5) business days from receipt of the notice thereof; the other party may terminate this Agreement;

(vi)    If either party fails to make any payment when due under this Agreement within ten (10) calendar days from receipt of written notice thereof the other party may terminate this Agreement; or

16

(vii)    Dealer commits, engages, or conspires in, or permits the commission of, on the Location, or anywhere else in connection with Dealer's business at the Location, any fraudulent or illegal act or if Dealer commits any omission or activity which adversely affects PTC's or any of its affiliates' best interest in connection with Dealer's business at the Location, or results in any investigation performed by PTC or on PTC's behalf indicates that Dealer has deprived PTC or any of its affiliates of rights or benefits relating to the parties' respective commercial interests, goodwill, reputation, or competitive position in the market.

(b)    Upon Termination of the Agreement, notwithstanding those terms and conditions contained within this Agreement the parties agree to the following:

(i)    On the date of termination, PTC shall remove any and all its Marks and signage at the Location pursuant to Section 9(b) and return the Location to a condition similar to the Commencement Date, normal wear and tear excluded;

(ii)    Unless purchased by Dealer pursuant to Section 9, PTC shall remove all of the Leased Equipment it provided and relinquish all rights in the Leased Equipment existing at the Commencement Date, normal wear and tear excepted;

(iii)    Any Additional Offering equipped with enhancements that are licensed by third parties shall be returned to PTC in good working order, normal wear and tear excepted unless otherwise agreed to in writing between the parties;

(iv)    Dealer agrees to acquire the diesel fuel existing in underground storage tanks for the Leased Equipment at the Location at the time of termination. Dealer and PTC shall multiply the diesel gallons, net of water, at a per-gallon price based upon the PTC's wholesale purchase price, including the cost of hauling, as represented by PTC's most recent invoices, bills of lading and hauling charges.

(c)    Remedies.    Unless brought to enjoin the use of the other's Marks or the unauthorized use of a license or trademark of a third party, all disputes under this Agreement shall be determined by Sections 28 and 29 below and any remedies shall be limited to monetary awards or settlements only, with interest at the prevailing national prime rate on the principal amount thereof.

27.    **Force Majeure.**    Neither party shall be liable for any damages or excess costs incurred by the other party for nonperformance of its responsibilities under this Agreement, and neither party's nonperformance shall be a default or grounds for termination of this Agreement, if such nonperformance arises from causes beyond its reasonable control and without its fault or negligence. Such causes may include, but are not limited to, (i) catastrophic natural events such as earthquakes, tornadoes or hurricanes, (ii) breakdowns in the normal delivery of public services such as electricity, telecommunications or transportation, and (iii) directions of any governmental body acting in its sovereign, judicial, or regulatory capacity.

28.     **Dispute Resolution**

(a)     If either party claims that the other party has breached any of its obligations under this Agreement and so notifies the other party in writing, then, prior to resorting to any other remedy, the parties shall first attempt to negotiate the dispute by telephone through designated senior management officials having authority to settle the dispute.  If such executives are unable to resolve the dispute by telephone within thirty (30) calendar days, then such executives, or other designated representatives of the parties having authority to settle the dispute, shall meet in person at a time and location mutually agreed upon by the parties in writing in advance to resume such negotiations for one (1) day.

(b)     If, having substantially complied with the provisions of paragraph (A), the parties fail to agree on a settlement, they shall then be free to pursue all rights and remedies afforded to them under applicable law, subject to all applicable provisions of this Agreement, including without limitation the following paragraphs 27, 28, and 29.

29.     **Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

30.     **Attorney Fees**.  In the event that either party shall engage an attorney to enforce, protect, or preserve any rights it might have under this Agreement, the prevailing party in such suit shall be entitled to recover its reasonable attorneys' fees (including associated costs) in addition to any other relief to which it may be entitled.

31.     **Limitation of Liability**. EACH PARTY ACKNOWLEDGES AND AGREES WITH THE OTHER, THAT IN NO EVENT WILL EITHER PARTY, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, SHAREHOLDERS OR REPRESENTATIVES BE LIABLE OR THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR AWARDS, INCLUDING DAMAGES OR COSTS INCURRED AS A RESULT OF LOSS OF TIME, LOSS OF SAVINGS, LOSS OF PROPERTY OR LOSS OF GOODWILL, WHETHER FORESEEABLE OR UNFORESEEABLE, WHICH MAY ARISE OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT.

32.     **Amendment.** Amendments to this Agreement shall be made only in writing signed by both parties.  No waiver by either party of compliance by the other party with any term or condition of this Agreement shall be valid unless in writing and signed by the party against whom enforcement of such waiver is sought.

33.     **Assignment.**  Dealer m ay not transfer or assign this Agreement or any part thereof (except to a person or entity that is directly controlled by one or more members of the family that controls Dealer or a trust for such a person's benefit) without PTC's prior written approval and consent.  PTC, without the prior written consent of Dealer, shall not: (i) sell, transfer, assign, or pledge the Agreement or any of the Leased Equipment; (ii) allow any of the

Leased Equipment to be used by any person or entity other than PTC or any of PTC's employees; or (iii) sublet any of the Leased Equipment. Notwithstanding the foregoing, either party may transfer its rights and obligations under this Agreement in connection with a sale of substantially all of its business and assets or in the event of a merger; provided however, Dealer will give notice to PTC of the identity of the proposed assignee and a complete and accurate copy of the written offer if the proposed assignment is in connection with a sale of the Location. PTC will have thirty (30) calendar days to perform its due diligence and assess the proposed assignee to determine if PTC will consent to the assignment, which said approval and consent shall not be unreasonably withheld, conditioned or delayed. Nothing contained within this Section shall be construed by either party as an option of terminating its obligations within this Agreement.

**34.** **Relationship of Parties.** The parties hereto agree that it is their express intent that nothing contained herein shall be construed as forming a partnership, joint venture, joint employer or franchise relationship between PTC and Dealer or creating a relationship of principal and agent between PTC and Dealer. Dealer shall be and remain in control of the management and operation of each part of the Location. Dealer has no authority to and shall not take any action obligating or binding PTC in any way. PTC shall have no responsibility or liability for (i) any act, failure to act, or decision by Dealer or any other person regarding the use, condition, or operation of the Location, (ii) the control or management of the Location, (iii) the safety of the Location or any operation of the Location, (iv) the safety or design of any operation, structure, or product, or (v) any decision regarding the employment or supervision of any person employed or contracted by Dealer in connection with the Location. Dealer shall have the sole right to supervise, procure, or cause to be procured all Services during the Term of this Agreement.

**35.** **Confidentiality/Non-Compete.**

(a) Confidential Information shall include: (i) the contents of this Agreement and all discussions that lead to the conclusion of this Agreement; (ii) the strategies, policies and procedures employed (or planned to be employed) by either party in the operation of its business, (iii) data regarding any PTC customer, data regarding PTC and affiliates, suppliers or any employee of either party involved in the fulfillment of this Agreement; or (iv) data regarding any Dealer customer, data regarding Dealer and its affiliates, suppliers or any employee of either party involved in the fulfillment of this Agreement ("**Confidential Information**").

(b) Each party agrees to maintain the other's Confidential Information in confidence during the Term of this Agreement and after termination of this Agreement, and not to disclose such Confidential Information to its employees and consultants, other than those directly involved in this Agreement, and not to disclose or permit access by any third party to any such Confidential Information, except to the extent disclosure is expressly permitted by the other party or required by law, and not to use any such Confidential Information except pursuant to the terms of this Agreement; provided, however, that neither party shall be liable to the other party for disclosure of Confidential Information if the same is (i) now in or subsequently comes into the public domain without the breach of this Agreement, (ii) known to the party without obligation of confidentiality before receipt of the Confidential Information from the other party, (iii) independently developed by the party without breach of this Agreement or (iv) rightfully

received by the party from a third party without breach of this Agreement or accompanying secrecy obligations.

(c)     Unless approved by PTC in writing, Dealer agrees that it will not, during the Term of this Agreement, compete with PTC or its affiliates, directly or indirectly, nor shall Dealer have a financial interest, directly or indirectly, in any entity which is in competition with PTC or its affiliates or is in conflict with PTC's best interests or the best interests of PTC's affiliates with respect to the marketing of PTC's company and related products.

(d)     Provided that Dealer is not in default under this Agreement beyond any applicable cure or grace period, Dealer shall have the exclusive right to sell and offer PTC's products and services within a five (5) mile radius and ten (10) linear miles along N. Okeechobee Road (U.S. 27); of the Location.  To that end, during the Term of this Agreement, neither PTC nor its affiliates shall be permitted to enter into, acquire or assume any other Equipment Lease and Thru Put Agreement or any such agreement creating a similar relationship as established in the Agreement.

(e)     This Section shall survive termination of this Agreement.

**36.     Miscellaneous.**

(a)     **Representations and Warranties on Signature and Authority.**  Each signatory of this Agreement warrants that he/she is an officer of the party to this Agreement which he/she represents and that he/she has the necessary authority to enter into this Agreement on behalf of such party.  Each party represents and warrants that it has the full power and authority to enter into this Agreement and to perform the duties and obligations herein.  Each party further attests that this Agreement constitutes its legal, valid and binding obligation and its Board of Managers or Executive Committee has approved this Agreement.

(b)     **OTHER AGREEMENTS:**  PTC AND DEALER REPRESENT AND WARRANT THAT IT WILL NOT VIOLATE ANY EXISTING AGREEMENTS BETWEEN THE PARTY OR ANY ENTITIES CONTROLLED BY, CONTROLLING, OR UNDER COMMON CONTROL WITH SAID PARTY BY ENTERING INTO THIS AGREEMENT (THE **"OTHER AGREEMENTS"**).  IN ADDITION, EACH PARTY HEREBY AGREES TO INDEMNIFY AND HOLD THE OTHER PARTY HARMLESS AGAINST ALL CLAIMS, DEMANDS, DEBTS, LOSSES, OBLIGATIONS, LIABILITIES, COSTS, EXPENSES, RIGHTS OF ACTION AND CAUSES OF ACTION, OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, FIXED OR CONTINGENT, LEGAL OR EQUITABLE, ARISING UNDER ANY APPLICABLE LAW, WHICH ANY PARTY MAY HAVE IN ANY CAPACITY, HAS EVER HAD, OR MAY HAVE IN THE FUTURE, FOR ANYTHING RELATING TO ANY CLAIMS WHICH RELATE IN ANY WAY TO THE OTHER AGREEMENTS, AGAINST THE INDEMNIFIED PARTY OR AGAINST ANY OF ANY THE INDEMNIFIED PARTY'S PAST, PRESENT OR FUTURE SHAREHOLDERS, PARTNERS, EMPLOYEES, DIRECTORS, OFFICERS, PARENT COMPANIES, SUBSIDIARIES, AFFILIATED CORPORATIONS, ESTATES, HEIRS, EXECUTORS, ADMINISTRATORS, TRUSTEES, SUCCESSORS, ASSIGNS, BENEFICIARIES, CONSULTANTS, ATTORNEYS, AGENTS OR REPRESENTATIVES.

(c)   **Captions.**   The captions of the sections of this Agreement are included for reference only and are not intended to be part of the Agreement or in any way to define, limit or describe the scope or intent of the particular provisions to which they refer.

(d)   **Covenant.**   Dealer covenants and warrants that it will not default on any material ground lease or agreement which would affect PTC's ability to lease the Leased Equipment pursuant to this Agreement.  In addition, Dealer covenants that the Location is currently properly zoned for the use required by PTC in conducting its business thereof.  If zoning or other laws or ordinance regulating the use of the Location, in effect at any time during the term hereof, shall make it unlawful or impractical for PTC to conduct its business or if Dealer defaults and loses its lease for the Location, then PTC shall have the right to terminate this Agreement; and, in the latter event only, Dealer agrees to immediately reimburse PTC the amortized cost for PTC's capital improvements and Additional Offerings for the Location pursuant to Section 9 above.

(e)   **Entire Agreement.** This Agreement and attachments to this Agreement represent the entire understanding and agreement between the parties hereto and supersedes any and all prior contracts in reference to the Location, whether written or oral, that may exist between the parties regarding the Location. No terms, conditions, prior course of dealings, course of performance, usage or trade, understandings, purchase orders, or contract purpose to modify, vary, supplement or explain any provision of this Agreement shall be effective unless in writing and signed by representatives of both parties authorized to amend this Agreement. This Agreement may be amended or modified only by written amendment signed by both parties.

(f)   **Compliance with Government Orders and Requests.**   PTC shall not be responsible for any delay in performance or the non-performance of its obligations which may results from its voluntary or involuntary compliance with any law, order, regulation, request or recommendation of any government authority or any persons purporting to act thereunder.

(g)   **Survival.**   Any provision of this Agreement that by its nature cannot be performed within the Term of this Agreement shall survive the termination of this Agreement and shall remain enforceable after such termination.

(h)   **Governing Law and Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and the laws of the United States applicable therein, without reference to conflict of law rules and/or provisions.

(i)   **Binding Effect.** All rights conferred by this Agreement shall be binding upon, inure to the benefit of, and be enforceable by or against the respective successors and assigns of the parties hereto.

(j)   **Subordination.**   This Agreement, and PTC's rights hereunder, are hereby made expressly subject and subordinate at all times to any and all mortgages, ground or underlying leases affecting the Location which have been executed and delivered by Dealer, or its affiliates, successors or assigns, and any and all extensions and renewals thereof and substitutions therefor and modifications and amendments thereof, and to any and all advances made or to be made under or upon said mortgages, ground or underlying leases. PTC agrees to execute any instrument or instruments which the Dealer or its mortgagee(s) may deem necessary or desirable to further evidence the subordination of this Agreement to any or all such mortgages which the

Dealer or it mortgagee may deem necessary or desirable to further evidence the subordination of this Agreement to any and all such mortgages, ground or underlying leases.  In the event PTC shall refuse after reasonable notice to execute such instrument or instruments, the Dealer may, in addition to any right or remedy occurring hereunder, terminate this Agreement without incurring any liability whatsoever and the estate hereby granted is expressly limited accordingly. PTC further agrees to make such reasonable modifications to this Agreement (not increasing PTC's obligations hereunder) as may be requested by the holder of any such mortgage, ground or underlying lease.

   (k) **Notices.** All notices, consents and other communications under this Agreement shall be in writing and shall be deemed to have been received on the earlier of (a) the date of actual receipt at the designated street address, (b) when confirmed receipt by carrier is given by a reputable overnight delivery service, or (c) when confirmed receipt by the Post Office is given after being mailed to the designated street address by first class mail.  Any notice may be given by fax to the designated fax number, provided that a written confirmation is received at the designated street address within forty-eight (48) hours thereafter.  All notices shall be sent to the following:

As to PTC:   Chief Financial Officer
       Pilot Travel Centers LLC
       5508 Lonas Road
       Knoxville, TN 37909
       (865) 474-2194
       Fax: (865) 297-1548

With a copy to:  General Counsel
       Pilot Travel Centers LLC
       5508 Lonas Road
       Knoxville, TN 37909
       Telephone: (865) 474-2219
       Fax:   (865) 297-1812

As to Dealer:   Ricardo Gonzalez, President
       Sunshine Plaza of South Florida, Inc.
       12200 NW South River Drive
       Medley, FL 33178
       Telephone: (305) 883-1004
       Fax:   (305) 883-1799

With a copy to:  Christopher D. Hale, Esq.
       Christopher D. Hale, P.A.
       633 Southeast Third Ave., Suite 4-F
       Fort Lauderdale, FL  33301
       Telephone: (954) 463-0795
       Fax:   (954) 463-1245

Not official Court Document

(l)     **Severability.**  The provisions of this Agreement are severable, and if any clause or provisions hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Agreement in any jurisdiction.  Any such clause or provision held invalid or unenforceable, in whole or in part, to the extent permitted by law, shall be restricted in applicability or reformed to the minimum extent required for such clause or provision to be enforceable.

(m)     **Further Assurances.**  The parties agree to execute such further reasonable documents or agreements and generally do or cause to be done other reasonable acts and things that may be necessary or desirable from time to time to give full effect to this Agreement.

(n)     **Exhibits**.  All attached Exhibits are a part of this Agreement and are incorporated in full by this reference.  Except as specifically provided herein, if any provision contained in any Exhibit to this Agreement is inconsistent or in conflict with any provisions of this Agreement, the provisions of this Agreement shall supersede the provisions of such Exhibit and shall be controlling.  The Exhibits may be amended from time to time by mutual agreement of the parties, provided that such amendment is written and executed by the undersigned parties.  In the event of such an amendment, the Exhibit shall be revised accordingly and shall be deemed to be incorporated into, and form a part of this Agreement as so amended.

(o)     **Drafting**.  This Agreement shall not be construed more strictly against one party than the other because it may have been drafted by one of the parties or its counsel, each having contributed substantially and materially to the negotiation and drafting hereof.

(p)     **Modification**.  No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless it is in writing and signed by the party against which the enforcement of the modification, waiver, amendment, discharge, or change is or may be sought.

(q)     **Non-Waiver.**  Neither the granting of time or other indulgence, nor the failure to insist upon the strict performance of any covenant, term or condition hereof, or the failure to enforce any rights herein shall be construed as a waiver of a party's rights or remedies herein and the same shall continue to be in full force and effect.  A waiver of any default hereunder shall not operate as a waiver of any subsequent default.  To be enforced, all waivers shall be in writing, signed by the waiving party, and delivered to the other party.  Either party's rights to demand strict performance of the other's obligations herein shall not be affected in any way by any previous waiver, forbearance, or course of dealing.

(r)     **Counterparts.**  This Agreement may be executed in counterparts, all of which shall be deemed to be duplicate originals.

**INTENTIONALLY LEFT BLANK**

**IN WITNESS WHEREOF** PTC and Dealer, by their duly authorized officers, have caused this Agreement to be signed and delivered as of the Effective Date.


**SUNSHINE PLAZA OF SOUTH FLORIDA, INC.**


By: _____
     **Ricardo Gonzalez**
     **Its: President**


**PILOT TRAVEL CENTERS LLC**


By: _____
     **Mitchell D. Steenrod**
     **Its: Senior Vice President and CFO**

24

**IN WITNESS WHEREOF** PTC and Dealer, by their duly authorized officers, have caused this Agreement to be signed and delivered as of the Effective Date.

**SUNSHINE PLAZA OF SOUTH FLORIDA, INC.**

By: _____
   Ricardo González
   Its: President

**PILOT TRAVEL CENTERS LLC**

By: _____
   Mitchell D. Steenrod
   Its: Senior Vice President and CFO

Not Official Court Document

24

**EXHIBIT A**
**Legal Description**

Lots 1, 2, 3, 12 and 13, Block 1, SEABREEZE INDUSTRIAL PARK SUBDIVISION, as recorded in Plat Book 154, Page 46 of the Public Records of Miami-Dade County, Florida.



**EXHIBIT B**
**Site Plan of the Location**



## EXHIBIT C
## THIRD PARTY BILLING AGREEMENTS

Dealer agrees to accept the following Third Party Billing Agreements from PTC's customers at the Location:

1. Comdata
2. EFS
3. JB Hunt
4. Multi-Service
5. T-Chek
6. FleetOne
7. Trendar
8. OPIS
9. American Express
10. Discover
11. Visa/MasterCard
12. Fuel Man
13. Voyager
14. Wright Express
15. Speedway
16. Pilot Fleet Cards
17. Maverick
18. Imperial Oil
19. Trans Comm, IPS, Transfund
20. NBS Loyalty Program (Driver Payback Cards)
21. Werner
22. FDIS
23. Husky and Husky Route
24. Petro Canada
25. TCH

27

## EXHIBIT D
## TRADEMARKS AND LOGOS

PTC TRADEMARKS:

The following Marks may be used at the Location for the sole purpose of providing agreed upon services to PTC's customers.  Dealer agrees at all times to use PTC's Marks with due care and to endeavor not to damage, diminish or devalue PTC's good will or trademark value.  Ownership of these Marks shall remain with PTC and PTC shall have the right to demand that Dealer stop use of these Marks or names at anytime, with or without cause, immediately upon demand.

Pilot Travel Centers
Pilot Fuel and go
Fuel N-Go
Crazee about Coffee
Pilot Good to Go!

Along with the following logos:

   

DEALER TRADEMARKS:

The following Marks may be used at the Location for the sole purpose of providing agreed upon services to Dealer's customers.  PTC agrees at all times to use Dealer's Marks with due care and to endeavor not to damage, diminish or devalue Dealer's good will or trademark value.  Ownership of these Marks shall remain with Dealer and Dealer shall have the right to demand that PTC stop use of these Marks or names at anytime, with or without cause, immediately upon demand.

28

**EXHIBIT E**
**LIST OF FACILITY REVENUE CONTRACTS**

Dealer shall be allowed to participate in the following PTC Facility Revenue Programs during the term of this Agreement at the Location listed in Exhibit A pursuant to the individual terms and conditions of each Program and Agreement PTC has with each vendor.

1. Pegasus Transflo
2. FCTI ATM
3. DAT Load Board
4. Randal/Reilly Publishing
5. Target Media
6. Truck Paper
7. Challenge Magazine
8. Motor Media
9. Pocket Media
10. Crane Vending





**Exhibit 2**

DocuSign Envelope ID: AE835FFB-CC8F-445E-BDA9-9D09ADAB3E77

## ADDENDUM TO EQUIPMENT LEASE AND THRU-PUT AGREEMENT

**THIS ADDENDUM TO EQUIPMENT LEASE AND THRU-PUT AGREEMENT** ("Addendum") is made and executed as of the _8_ day of _September_ 2020, by and between **SUNSHINE PLAZA OF SOUTH FLORIDA, INC.**, a Florida corporation with an address of 12200 NW South River Drive, Medley, FL 33178 ("Dealer"), and **PILOT TRAVEL CENTERS LLC**, a Delaware limited liability company with an address of 5508 Lonas Drive, Knoxville, TN 37909 ("PTC").

### WITNESSETH:

**WHEREAS**, PTC and Dealer entered into an Equipment Lease and Thru-Put Agreement dated February 23, 2011 (the "Agreement"), for the lease of diesel fuel dispensers and related equipment located at 12200 NW South River Drive, Medley, Florida (the "Location"); and

**WHEREAS**, the parties have agreed to make certain improvements at the Location, extend the Term of the Agreement, and otherwise modify the Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.	**Defined Terms.**  Unless otherwise defined herein, capitalized terms used in this Addendum shall have the meanings set forth in the Agreement.

2.	**Interpretation.**  To the extent that the terms and conditions of this Addendum conflict with the terms and conditions of the Agreement, the terms and conditions of this Addendum shall control.

3.	**Improvements.**  PTC shall make the following improvements at the Location, at PTC's sole cost, within One Hundred Eighty (180) days after the full execution of this Addendum: (a) replace commercial diesel dispensers with new dispensers; (b) reimage gas and diesel canopies and signage with PTC's current branding scheme; (c) remodel the three (3) showers at the Location to PTC's standards; and (d) add an above-ground DEF storage tank and pipe DEF to all commercial diesel lanes.

4.	**Extension.**  The parties agree that the first two (2) Options (as defined in Section 2 of the Agreement) are hereby exercised such that the term of the Agreement is hereby extended until February 22, 2031 (the "Extended Termination Date). Two Options shall remain for extending the Term beyond the Extended Termination Date, on the terms set forth in the Agreement.

5.	**Amended Provision.**  Section 13 of the Agreement is hereby amended by deleting the last sentence thereof and replacing it with the following:

"PTC shall own the equipment, be entitled to encumber the equipment, and retain all profits and revenue generated by the sale of DEF; provided, however, that PTC agrees to pay

DocuSign Envelope ID: AE835FFB-CC8F-445E-BDA9-9D09ADAB3E77

Dealer, each month, fifty percent (50%) of the net per gallon margin for each DEF gallon sold. Dealer agrees to operate and maintain the DEF Units in the same manner as it operates and maintains the USTs pursuant to <u>Section 7</u>."

6.      **Ratification**.   Except as herein modified, all terms and conditions of the Agreement shall remain in full force and effect, shall not be considered amended or modified except as is specifically set forth in this Addendum, and are hereby ratified and confirmed in all respects.

7.      **Counterparts**.  This Addendum may be executed in counterparts, each of which will be deemed to be an original and taken together shall be considered as one document. Signatures delivered by facsimile, scanned .pdf image, or other electronic means shall have the same force and effect as original signatures.

**IN WITNESS WHEREOF**, this Addendum has been executed on the day and date first above written.

**SUNSHINE PLAZA OF SOUTH FLORIDA, INC.**

By: _____
Name: _____
Title: _____

**PILOT TRAVEL CENTERS LLC**

By: _____
Name: David Clothier
Title: VP Finance

Not Official Court Document